Good morning, Your Honor. It's Charles Fleischman, appearing for the appellant, Mr. Armani. I think the central issue in this whole case is the meaning of sedentary work in the context of a disability claim, and I think the meaning is pretty clear, and I think the judge got it all wrong. If we agree that the judge got it wrong because the judge didn't realize that the same standard can be used in ERISA cases, why wouldn't we send it back and tell him to make new findings? For instance, there was some person involved said, okay, well, even if you can't sit for six hours or whatever it is, these days we have sit-stand contraptions that a lot of us clerks use all the time, and didn't they actually suggest that, and we don't have the findings on that, do we? Yes, the judge, he got that wrong, too. If you look at that note that that person said, the sit-stand thing was supposed to come in after he had had surgery. If he has surgery, first they came up with the sit-stand business, and then they realized that they got some new notes in that said he had radiculopathy from the herniated discs, and then they said, okay, he's probably going to need surgery. The sit-stand accommodation will work after he has the surgery. What does he do today? What is he doing today? I mean, does he lie down all day? What does he do? I don't know what these people with bad backs do, but there are millions of them throughout the country.  I guess they try to take medication for the pain. I mean, there's no question he's got the problem, and you've got all the objective tests you could ever want showing he's got two herniated discs. He's got radiculopathy. My reading of the dictionary is that just means a pinched nerve. Is that right? That's what it is. It's a pinched nerve, and if you've ever had one, for some people it's debilitating. I understand. And all the doctors agree he can sit at most for four hours on an eight-hour workday, and why not send it back to the judge to decide? Because you have all the evidence that the judge has. Wait one second. Hold on. Hold on a second. There's something. I want to go back to the core of what's at stake here, and as I understand it, the district judge said, you want to take this definition that's coming from Social Security cases. These programs are fundamentally different, and we shouldn't apply from Social Security a doctrine over here in ERISA. Right? Yeah. But isn't here what the insurance company pointed to when they were looking for alternative means of work, of sedentary work, they found or they said there are three other positions, including his own, that he could perform, and they're sedentary under the DOT. They're defined as sedentary positions under the Dictionary of Occupational Titles, correct? And as I understand it, the Social Security Administration also looks to the Dictionary of Occupational Titles, correct? I think they write it. Now, Social Security hasn't ‑‑ have they issued a regulation or a program bulletin that says that sedentary, mostly sedentary or mostly sitting during the day, means you can't six hours or you can't sit for more than six hours? As Social Security Administration itself, I don't know, but I know there have been Social Security courts, I mean, courts that are dealing in Social Security cases and courts dealing in ERISA cases. Interpreting the DOT. Yes. Correct. Now, the Ninth Circuit hasn't addressed this issue. Is that correct? District courts. Yes, district courts have, and they all seem to be saying you look to ‑‑ mostly sitting means more than six hours or whatever. You have to at least be able to sit more than six hours. Is that right? Now, here on the critical dates here, the evidence was that he could only sit for about four hours a day and walk for two hours and stand for two hours. Is that right? Well, it said two to four hours sitting. Right. Yeah, and all the defense doctors agreed. So there's nothing ‑‑ if you were to look at the record as it was when his benefits were denied, that's what we would see. Yes. Right? Yes. Now, if we were to say that the district court erred in that respect, that would essentially mean that he would get benefits up to that point, right? Or he'd get back benefits and all that. No, he would get benefits into the future up until ‑‑ But they can always go in and reevaluate, correct? Yeah, they can do it tomorrow. So they could take another run at this. That's true of every ERISA disability case. They can always do that. It always goes back to the plan where they have to start paying out the money, and then they can turn around tomorrow and send them to another doctor, or well, they never send them to a doctor, but they can send them to a doctor for a medical exam, or they could find some records, or they can just decide we're going to cut them off again. Well, they have to have a reasonable basis, right? They have to have a reasonable basis? Yeah. When they're dealing with the Social Security definition and they know that all the doctors say four hours and the Social Security definition says six hours, there was no reasonable basis at all. I'm just positing they were doing it for a reasonable basis. I would like to reserve the rest of my time. Yes, that's fine. Thank you. May it please the Court. Linda Lawson appearing on behalf of Northwestern Mutual. Your Honors, this case goes well beyond the definition of sedentary. Mr. Armani has the burden of proving that he is entitled to benefits. The medical records in this case stopped. Up until the time that Northwestern closed the claim, the most current medical records found that Mr. Armani's chiropractor scheduled him to return to work May of 2013. The denial was not made until the summer of 2013. All during the appeal period, Northwestern Mutual asked counsel, asked Mr. Armani through counsel, to provide additional medical evidence that would support ongoing disability and, furthermore, would support that he was not capable of performing the sedentary work that was identified by Northwestern Mutual in its closure letter. And how did Northwestern define sedentary work in that closure letter? In the closure letter, there was a reference to the Department of Labor DOT. The Department of Labor discusses sedentary and, Your Honor, in terms of answering your prior question, there are within the confines of Social Security code of federal regulations that ALJs are required to follow in order to establish grids and entitlement to Social Security benefits. I would respectfully submit that Social Security system is completely different. Well, I understand it's different, but they're looking at a dictionary of occupational titles. I mean, we do it all the time. Every time we do a Social Security case, the last step in the five-step process is, you know, what kind of work can the claimant do in light of their residual functional capacity? And you look at their ALJs, look at their dictionary of occupational titles all the time. It's something we deal with all the time. Correct. Now, going to the DOT, it specifically says that sedentary work generally involves sitting most of the time. Most of the time. Most. So is the ability to only sit for four hours, is that sitting most of the time? Your Honor, when there are accommodations there can be. Answer my question. Yes, Your Honor. When there are accommodations there can be. So sitting four hours a day is sitting most of the time? Not to be precise to that question. I agree with you that sitting an average amount of time. That strikes me as a little odd. I'm sorry? That strikes me as a little odd. But, Your Honor, what we have to do with an insured is look to the restrictions and limitations and see if that person is capable of performing sedentary work. Here, the employer found and notified Northwestern that reasonable accommodations could be made. Northwestern determined by virtue of a vocational review that a sit-stand workstation is very common in the workplace. If you look at Dr. Padveen's, the chiropractor, restrictions and limitations, it's four hours a day sitting, two hours a day standing, two hours a day walking. With a sit-stand workstation, it is absolutely possible and within reason to determine. Let me ask you this. What were the three positions in the closure letter that Northwestern had in mind? Just a moment, Your Honor. Do we know? The closure letter, which is found at excerpt record starting at 147, going over to page 152. It is a manager, risk and insurance manager, manager, credit, and collections. In each of those, the vocational expert looked at restrictions and limitations that Dr. Padveen had provided, also looked at the independent physician consultant reviews that Northwestern had performed, first by a Dr. Hart and then, on appeal, by a Dr. Hahn. And each of those two doctors disagreed with the restrictions and limitations that Dr. Padveen had described. There had not been an MRI or an EMG on Mr. Armani since 2011. There had been no treatment other than conservative treatment, no epidural injections, and I understand counsel's position that his client was worried about having epidural injections. There was no recommendation for surgery, although there was early on. That is exactly why Northwestern continued to pay benefits because even though Dr. Hart initially determined that there should not be restrictions and limitations in performing his job, because he was being evaluated by orthopedic surgeons, Northwestern continued to pay, and it was only after there was no ongoing treatment by those surgeons. But Northwestern had brought in its own doctor to examine him, and if so, it didn't, right? They didn't. Your Honor, they didn't. Pursuant to terms of plans, it is possible to have an independent medical examination done. However, there are duties that insurance companies owe to the plans to be cost-effective, and in terms of doing their review, paper reviews are accepted by the courts, and it is not necessary to do independent medical examinations. It is not the law of the Ninth Circuit that carriers are required to do independent medical evaluations, and, in fact, the United States Supreme Court, in Black and Decker-Nord, specifically said that Social Security requirements regarding giving deference to treating physicians do not hold in the evaluation of ERISA cases. So, again, based upon the medical records, more importantly, the complete lack thereof, there was no medical documentation that supported Mr. Armani's claim that he was entitled to ongoing disability benefits past the time of the closure. The standard for this court to review the district court's determination is it must be clear error in terms of factual findings. Conclusions of law? De novo. But there was a dearth of medical documentation that supported disability other than the form where Dr. Padbean indicated that he believed that Mr. Armani could return to work without restrictions in May of 2013. The denial, again, was made in July, and Mr. Armani, through counsel, was invited to submit any evidence to support his claim, and he clearly bears the burden. I'd like to ask a question, though. Please. Was it proper for the district court to exclude Exhibit 3, the August 7, 2013, medical evaluation, which would have refuted the part of Northwestern Mutual's appeal decision stating that Armani could not demonstrate a disability after July of 2013? Your Honor, I believe the court was correct. The reason being the OPEDA decision clearly sets forth criteria when a court can look beyond the administrative record. I think the law in the Ninth Circuit is very clear that absent exceptional circumstances, and I do not believe exceptional circumstances arose here, that a district court should be limited in its review of the administrative record, and I think the court appropriately did that. Isn't that just true when it's an abusive discretion standard in terms of the insurance company and where there's really just almost no review? And that wasn't the case in this policy. I'm sorry? I'm not stating it. I'm obviously not stating it very clearly. There's two standards of review. In this one, Northwestern actually didn't have the strictest one. I mean, there are some where the courts really can barely look at them because it's just essentially you'd have to find an error that's completely egregious and it has to be based on the administrative record. That's the abusive discretion, and I believe that the Ninth Circuit is not as liberal. However, this was reviewed under a de novo review, but even under a de novo review it is the responsibility of the district court to step in to the administrator's role and see if there is sufficient information. The information that came in after the fact was not submitted during initial disclosures. It was not submitted at any point in time up to the briefing. And again, the court determined that based upon its review of the record in its entirety, not just an isolated form, but a review of all of the medical records and a review of the independent physician consultant's reviews and a review of the vocational reviews, that other than a form that simply checked two to four, and I believe significantly, Your Honor, in that form, all the doctor said is Mr. Armani was temporarily totally disabled from his job. The district court determined that he was entitled to be paid benefits for the balance of his own occupation. We are not here on that issue. That medical record did not say that he is totally disabled from performing alternative occupations, so that did not go to proving continued disability under the any occupation standard because there was a change of definition in this case as of July 17 of 2013. And if you look at the four corners of that medical record, the district court got it right. There was nothing in that record that proved that it was ongoing disability. Let me ask you. This closure letter that was sent to Mr. Armani, at the end, it just says we determine that you're capable of sedentary work and they identify three alternatives, say that these occupations exist in your labor market in sufficient numbers. They don't say that you could work in any of these sedentary jobs with some modifications, as you were pointing out. Not in this particular letter. Well, this is the denial letter, right? I understand, Your Honor. Right? Your Honor, what is it? So they just say, they point to the Dictionary of Occupational Titles and they identify the standard for sedentary. You know, we know that sedentary under the DOT means sitting most of the time. And, you know, I thought the evidence showed that he could not sit for more than four hours. It was an opinion by a chiropractor, Your Honor. Well, I mean, as a chiropractor, you know. I understand. But going back, if I may, Your Honor, to the. Supposed to just disregard the chiropractor because he's not a physician? Not at all, Your Honor. But we are not required to give deference to him. We had it independently reviewed by Dr. Hart. And if you stick with the closure letter at page, the Excerpt of Record 152, we specifically advise, as I indicated before, if you want your claim in this decision reviewed, you have the right to submit additional information. It would be helpful to include medical documentation supporting that you are unable to perform a sedentary-level occupation on a full-time basis and nothing was submitted. Now, you don't claim that he didn't exhaust all his remedies through the plan? No, he did appeal. All right. Thank you. Thank you, Your Honor. Your Honors. First of all, a lot of this evidence that came from counsel's argument is not in the administrative record at all. With regard to virtually every doctor that was asked, including the defense doctors, agreed that he could only sit for four hours at most. And that's not just the Dr. Pardeen or whatever his name is, the chiropractor. They all agreed, even the defense doctor agreed. If you've got a guy that can only sit for four hours, what additional evidence? And the question is, what evidence do you have that you can't do a sedentary job? How about I can't sit for four hours? What else do you want to hear? Anyway, the fact that they had no authorization to get medical records, they were supplied an authorization. It's in the supplemental excerpts of record. They were supplied one. It was late, but they had time to use it. They chose not to do it. They chose not to use it. With regard to the ergonomic stations, the note in fact reads, and this is found at excerpts of record 154, the person is told about the radiculopathy, and then she writes, as this is the case, I was asked to complete my review and make a recommendation that an ergonomic evaluation be considered as an intervention once the claimant has recovered sufficiently to consider his return to work options. So this wasn't he can use an ergonomic station now. It's when he gets better he can use an ergonomic station. As a matter of fact, two or three days after this expert wrote this opinion, they granted him the disability benefits under his own occupation. Now, when they found jobs that he could do under the DOT, one of those jobs that he could do was his own occupation, along with the other three that counsel told you about. And that occupation, in the description of that occupation, is it requires seven hours of sitting. So if that required seven hours of sitting, and that's one of the occupations that they found in the DOT that he could perform, it doesn't make any sense. But it does if you look at the excerpts of record 161. This is the report of the vocational rehabilitation person. The information that he had came strictly from Dr. Hart with regard to what Mr. Armani could do or not. He says, the vocational expert writes, the analyst refers to a physician consultant memo prepared by John Hart, DO, physician consultant dated 5-13. Upon review of the medical information, Dr. Hart opines, it is my opinion that the claimant is capable of doing a sedentary level occupation without limitations or restrictions. So the only information this guy had, upon which he was looking for jobs from Mr. Armani, is Dr. Hart's opinion that this guy could do a sedentary job. Even though Dr. Hart knew that a sedentary job required six hours, or he should have, and he agreed, along with all the other defense doctors, that Mr. Armani could only sit for four hours. Okay. There's one more point I wanted to make. Sure? Yes. I shouldn't, but I'm sure. I never could understand when they claim he didn't give us enough medical information when they deny the claim. There's no question that he can't sit for more than four hours. Everybody agrees. So what other additional information are they looking for? If they had gone out and gotten more information, are they saying, we didn't have enough information to make a decision, therefore we denied the claim? Or are they saying, if you'd have given us more information, you would have won? What are they talking about? It doesn't make any sense, that request. Anyway, I'll submit it. Thank you. Thank you. Thank you, counsel. We appreciate your arguments. The matter is submitted at this time.
judges: D.W. Nelson, Paez, Bucklo